IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MICHELLE D. SIMMONS** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **PJM 08-1844** |
| | * | |
| **THE STANDARD FIRE INSURANCE COMPANY**[1] | * | |
| | * | |
| | * | |
| Defendant. | * | |

## **OPINION**

Michelle Simmons, *pro se*, has sued The Standard Fire Insurance Company ("Standard Fire"), alleging that it breached the terms of the fire insurance policy she had with it and failed to act in good faith as required by Section 27-1001 of the Maryland Code's Insurance Article. Standard Fire has filed a Motion for Summary Judgment [Paper No. 28], arguing that Section 27-1001 does not apply retroactively, that it fully satisfied such obligations as it had under the policy, and that in any event Simmons is not entitled to recover consequential damages.

---

[1] Simmons sued "The Travelers d/b/a Standard Fire Insurance Company." Standard Fire has responded in its correct name. The Clerk of Court will be **DIRECTED** by separate memorandum to change the caption of the case accordingly.

Decision on Standard Fire's Motion for Summary Judgment will be **DEFERRED** for ninety (90) days. Within that time, Simmons is **DIRECTED** to put forth evidentiary materials, addressing each of the concerns raised by the Court in this Opinion. The Court will then revisit Standard Fire's Motion for Summary Judgment.

**I.**

**A.**

Simmons had an insurance policy with Standard Fire covering her residence at 5815 66th Avenue in Riverdale, Maryland, effective from October 29, 2005 to October 29, 2006. On October 11, 2006 a fire seriously damaged the residence.

Section I of the policy provided coverage for Simmons' dwelling (Coverage A), other structures (Coverage B), personal property (Coverage C), and loss of use of the premises (Coverage D). Coverage D extended coverage to "any necessary increase in living expenses" as well as the fair rental value of the residence for the "shortest time required to repair or replace the premises." Standard Fire's liability was capped at $140,000.00 under Coverage A and $42,000.00 under Coverage D.

An endorsement to the policy, HO-827 (02-03), provided additional coverage for remediation costs, any "reasonable and necessary increase in living expense," and testing and monitoring expenses caused by a peril covered under Section I that resulted in "'fungi,' [and] other microbes or rot," where "fungi" includes mold. The endorsement stated that "[t]he most [Standard Fire] will pay under this additional coverage is the limit of liability shown in the Declarations for Limited 'Fungi', Other Microbes Or Rot Remediation," which the Declarations Page identifies as $5,000.00. Coverage for "'[f]ungi,' other microbes or rot" was otherwise expressly excluded except for (1) "remediation coverage" afforded under the referenced

endorsement and (2) "'[f]ungi', other microbes or rot [which includes mold] that results from fire or lightning."

**B.**

On October 12, 2006, the day after the fire, Ashanti Barfield, the claim representative assigned by Standard Fire, inspected the damage to Simmons' residence, and on October 21, 2006, prepared an initial building estimate. Several days later, Standard Fire paid $36,085.55, the cash value of the damage to the dwelling under Coverage A, directly to Simmons' mortgage company.

More or less simultaneously, Barfield advised Simmons that she had the right to select a contractor to make appropriate repairs. She began researching contractors on October 16, 2006, but several of the contractors referred to her by Standard Fire failed to show up for scheduled meetings. However, on October 26, 2006, Simmons obtained an estimate from a contractor arranged by her on her own, then on October 31, 2006, she obtained a second estimate from another contractor arranged by her on her own, Reliable Home Design ("Reliable"). On November 13, 2006, Simmons received a third estimate from a contractor referred by Standard Fire, CRM Constructions ("CRM").

On November 21, 2006, Simmons forwarded to Standard Fire the two estimates from the contractors she had arranged on her own. On the same date, however, Standard Fire informed her that the estimates were not itemized in sufficient detail. Then, a week later, Simmons sent Standard Fire the estimate from CRM Constructions. Shortly thereafter, Barfield approved CRM's estimate, with only minor changes. Accordingly, on December 21, 2006, based on CRM's estimate, Barfield revised Standard Fire's estimate for Coverage A loss and a few days later sent Simmons a supplemental Coverage A payment of $9,770.70 based on the revised cash

-3-

value of the damage and $1,703.11 for the cleaning of the structure.

On January 11, 2007, Simmons informed Standard Fire that she had chosen Reliable, one of her independently solicited contractors, to perform repairs. Although Barfield informed her at first that Reliable's estimate still needed to be further itemized, following a meeting between Barfield and a representative from Reliable, Reliable agreed to complete the work based on Standard Fire's estimate.

Some time prior to this, on or about November 15, 2006, Simmons had informed Standard Fire that she observed mold on the ceiling of her living room. Because Barfield and Reliable discovered additional mold during their meeting, Barfield recommended that Simmons engage a company called Servpro as a mold remediator. On January 30, 2007, after Reliable had removed the ceiling of Simmons' dwelling, Barfield inspected the mold throughout the residence. A mold test completed in early February 2007 showed that the concentration of mold was seven times higher upstairs and ten times higher downstairs, compared to outdoor mold levels.

On February 14, 2007 Standard Fire sent Simmons yet another supplemental Coverage A payment of $1,525.05 based on the revised determination of the cost of repairing the dwelling and $2,782.69 "for mold remediation under Coverage A's sub-limit for mold."[2] On February 18, 2007, Barfield estimated the cost of containing the mold for the entire house as $6,761.26, but two days later, Standard Fire revised this estimate downward to $6,146.15. On February 20, 2007, Standard Fire sent Simmons a check for $2,217.31, what remained on the $5,000 that Standard Fire took to be the limit for mold remediation. Simmons says she requested that

---

[2] From November 2006 to January 2008, Standard Fire maintained that its limit of coverage for mold damage was $5,000.00. According to Simmons, however, Standard Fire conceded in 2008 that "the coverage was never limited." Presumably Standard Fire disagrees with this contention.

Standard Fire pay for mold remediation costs exceeding $5,000 because, in her view, the excessive mold resulted from Standard Fire's delay in paying for the remediation, but Standard Fire refused. Standard Fire, however, in what it apparently considered a courtesy, refunded to Simmons the $1,000 deductible on her policy, effectively acknowledging that the mold remediation costs in fact exceeded the $5,000 limit.

Standard Fire also sent Simmons another supplemental Coverage A payment of $5,852.31 to cover the cash value of Standard Fire's final estimate of building repairs. Standard Fire also alleges that during the course of this litigation, it paid Simmons an additional $146.15 for mold remediation.

In total, Standard Fire paid Simmons $54,936.79 under Coverage A for damage to the dwelling, plus $6,146.15 for mold remediation, which included the $1,000 that was otherwise deductible under the policy.

## C.

As a result of the fire, which rendered Simmons' residence uninhabitable, she was forced to move to rental property. On October 24, 2008, on behalf of Standard Fire, Barfield approved a six-month lease on the rental property and a similar lease for furniture rental per Coverage D of the policy and mailed her a payment for her November rent and for rental furniture. At the same time, Barfield informed Simmons that Standard Fire would only make Coverage D payments through April 30, 2007. From November 2006 to March 2007, Standard Fire made five more payments to Simmons for her rent and rental furniture.

On January 12, 2007, Barfield informed Simmons that she could recover additional payments under Coverage D if her roommate had been paying her rent prior to and up to the time of the fire. On January 16, 2007 Simmons advised Barfield that indeed her roommate had been

-5-

renting at the time, paying her approximately $600 per month. Standard Fire says that three months later Barfield requested Simmons to provide additional documentation for the claim of lost rental income and increased utility bills but Simmons never did so.

In total, Standard Fire paid Simmons $21,357.70 under Coverage D.

## D.

Dissatisfied with various aspects of her dealings with Standard Fire, Simmons filed a complaint with the Maryland Insurance Administration ("MIA"), arguing, *inter alia*, that Standard Fire had denied her right to work with the contractor of her choice. On June 29, 2007, the MIA denied Simmons' claim, finding that Standard Fire had in fact informed Simmons of her right to choose her own contractor and, moreover, that it had paid her the policy's $5,000 limit for mold remediation. Simmons requested a hearing, which was held on February 4, 2008, but later that month withdrew her appeal.

On March 21, 2008, Simmons filed a second complaint with the MIA, asserting breach of contract and bad faith by Standard Fire. On May 27, 2008, the MIA again denied her claim. From that decision, Simmons filed a Notice of Appeal with the Circuit Court for Prince George's County. Standard Fire removed the case to this Court on July 15, 2008.[3]

## II.

A movant is entitled to summary judgment if the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[3] On August 5, 2008, the Court granted the Motion to Withdraw filed by Simmons' attorney and stayed the proceedings for 90 days. Simmons subsequently filed a Motion to Appoint *pro bono* Counsel. The Court appointed C. Bruce Anderson, Esquire, not to represent Simmons *pro bono*, but to conduct a five-hour neutral review of the case and report back to the Court. The Court received Anderson's report on June 2, 2009, in which he recommended that the case should go forward. Thereafter, the Court directed Standard Fire to file a dispositive motion. Standard Fire's Motion for Summary Judgment, now before the Court, followed.

matter of law." FED. R. CIV. P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand summary judgment, the nonmoving party must prove that there is a "genuine issue of material fact," *Matsushita Elec. Indus. Comp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but only after the moving party satisfies its burden of producing evidence establishing that no such issue exists. *Celotex*, 477 U.S. at 322. The "mere existence of a scintilla of evidence" will not be sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The court must view the facts and all inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 586. Although *pro se* pleadings are "held to less stringent standards than formal pleadings drafted by lawyers," *Allen v. Brodie*, 573 F. Supp. 87, 89 (D. Md. 1983) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)), they "must still set forth facts sufficient to withstand summary judgment." *Symeonidis v. Paxton Capital Group, Inc.*, 220 F. Supp. 2d 478, 480 n.4 (D. Md. 2002).

## III.

As the record now stands, Simmons is perilously close to having summary judgment entered against her. However, because of the unusual nature of the case and because Simmons is proceeding *pro se* and the parties have yet to conduct discovery, the Court will defer granting summary judgment at this time. *See Dolgaleva v. Va. Beach City Pub. Sch.*, No. 08-1515, 2010 WL 325957, at *5 (4th Cir. Jan. 29, 2010) (describing the importance of district courts providing *pro se* litigants with a full opportunity to submit the materials necessary to render summary judgment because "[t]he rights of pro se litigants require careful protection where highly technical requirements are involved" (citation and quotation marks omitted)). The Court does this in order to give Simmons an opportunity to satisfy her not insubstantial burden as the

7

nonmoving party in a motion for summary judgment.

Simmons must understand that to satisfy this burden and survive summary judgment, she, as the nonmoving party, must "go beyond the pleadings and [must] by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). She, as the nonmoving party, does not need to "produce evidence in a form that would be admissible at trial," but she must still submit competent evidentiary materials. *Id.* She cannot rely exclusively on allegations or denials in her own pleadings. FED. R. CIV. P. 56(c). "If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Celotex*, 477 U.S. at 330.

In the case *sub judice*, to survive summary judgment, Simmons must provide evidentiary materials addressing a number of items. With regard to her request for additional payments to cover the cost of repair and replacement of her home, she must submit evidentiary materials from a competent source establishing (1) that all the damage to the residence she claims was caused by the fire and (2) that the cost of repairs she claims is fair and reasonable. Simmons' statements alone will not suffice. Nor will the word of a contractor alone be sufficient to establish that the fire was in fact the cause of the damage. Simmons could, however, submit an affidavit from a fire appraiser opining as to the cause of the damage to her dwelling.

Apart from a statement from a competent individual as to causation, Simmons must provide the Court with evidentiary materials substantiating that $97,000.00, the amount she seeks as damages for the cost and replacement of her residence, was the fair and reasonable cost for such repair. Again, her word alone will not suffice, but the affidavit of a contractor in this instance would. Simmons must provide specific evidence showing that the reasonable cost for repairs exceeded $54,936.79, the amount that it appears Standard Fire paid under Coverage A, apart from the $6,146.15 it paid for mold remediation.

With regard to mold remediation expenses, assuming for present purposes (but not finally deciding) that the endorsement's $5,000 limit for mold remediation does not apply in this case, Simmons' submissions are similarly deficient. She has submitted no evidentiary materials establishing that the mold damage she claims was in fact caused by the fire or that it occurred as a result of Standard Fire's unreasonable delays, or that the fair and reasonable cost of remediating the mold damage caused by the fire was greater than the $6,146.15 paid by Standard Fire. Here, too, Simmons must produce documents from competent sources addressing each of these issues. A contractor will not be competent to establish that Simmons' mold damage was caused by the fire; someone familiar with mold damage will have to do that. A contractor, however, could provide an estimate for what constituted the fair and reasonable cost of the mold remediation.

With respect to damages for loss of use of the dwelling and for alternative living expenses, again Simmons has provided no evidentiary materials tending to prove that Standard Fire's payment of $21,357.70 under Coverage D was insufficient. As to the loss of use, she has provided no documentation of a rental agreement with a roommate prior to the fire. As to alternative living expenses, she has provided no evidence showing that Standard Fire did not pay

9

for her reasonable living expenses during the six months after the fire, as Standard Fire apparently did. Moreover, she has provided no evidentiary materials suggesting that six months was an unreasonable estimate for the "shortest time required to repair or replace the premises," the duration of coverage for these expenses under Coverage D of the policy.

Finally, with respect to her claim for damages pursuant to Section 27-1001 of the Maryland Code's Insurance Article, which the Court assumes for argument's sake applies in this case,[4] Simmons will have to provide specific evidence demonstrating that Standard Fire failed to act in good faith. The evidence currently before the Court does not suggest that Standard Fire failed to act in good faith. From all appearances, Standard Fire made multiple inspections of Simmons' residence, updated its building estimate on multiple occasions, and communicated regularly with her and her chosen contractor. Simmons is reminded that, in the face of this, she has the burden of producing evidentiary materials showing that Standard Fire did not make an honest and diligent effort to comply with its obligations. Simmons merely saying so will not make it so and, in accordance with the standards for summary judgment, will not create a triable issue.

The Court is aware that it is presenting Simmons with a formidable task. At this stage, she very well may not be able to produce the sort of evidence that will permit her to overcome summary judgment. But, as the record now stands, she certainly cannot withstand summary judgment. What the Court intends, however, in recognition of her *pro se* status, is to give

---

[4] *See Cecilia Schwaber Trust Two v. Hartford Accident & Indem. Co.*, 636 F. Supp. 2d 481, 488–89, 491 (D. Md. 2009) (holding that "there is sufficient evidence in the statutory text and legislative history to rebut the presumption of prospective application and demonstrate that the legislature intended for [Section 27-1001] to apply retroactively," and that retrospective application of Section 27-1001 would not violate the Contract Clause of the U.S. Constitution, but reserving ruling on whether retroactive application would violate the Maryland Declaration of Rights or the Maryland Constitution).

Simmons one last opportunity to submit such materials as she may have.  If she can successfully do so, well and good.  But she is pursuing a serious and substantial claim against Standard Fire, which is entitled to have her abide by the rules.

Accordingly, the Court **DIRECTS** Simmons to submit appropriate evidentiary materials to it (copies to counsel for Standard Fire) within 90 days of the date of this Opinion, addressing each of the concerns discussed in the Opinion.  If she fails to do so, or if the materials are deemed insufficient, the Court will revisit and grant Standard Fire's Motion for Summary Judgment.

## IV.

The Court **DEFERS** Defendant's Motion for Summary Judgment [Paper No. 28] for ninety (90) days.

A separate Order will issue.

/s/
PETER J. MESSITTE
May 5, 2010                                  UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MICHELLE D. SIMMONS** | * |
| Plaintiff, | * |
| v. | * Civil No. **PJM 08-1844** |
| **THE STANDARD FIRE INSURANCE COMPANY** | * |
| Defendant. | * |

## ORDER

Upon consideration of Defendant's Motion for Summary Judgment [Paper No. 28], and Plaintiff's Opposition thereto, it is, for the reasons stated in the accompanying Opinion, this 5th day of May, 2010,

**ORDERED**

1. Defendant Standard Fire's Motion for Summary Judgment [Paper No. 28] is **DEFERRED** for ninety (90) days; and

2. Plaintiff Michelle Simmons **SHALL HAVE** 90 days to produce appropriate evidentiary materials that address each of the concerns raised by the Court in the accompanying Opinion.

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE